[S. F. No. 20716. In Bank. Oct. 24, 1962.]

AGGREGATES ASSOCIATED, INC., Plaintiff and Respondent, v. PAUL PACKWOOD, Defendant and Appellant.

Gilbert Moody and Hilary Cook for Defendant and Appellant.

Frederick S. Reinheimer for Plaintiff and Respondent.

DOOLING, J. pro tem.*—Plaintiff recovered a judgment against defendants Smith and Packwood in the sum of $1,-819.84 and Packwood has appealed.

Smith became indebted to plaintiff in this amount in 1957 and the judgment against Packwood was based upon findings that in 1959 Smith transferred certain property owned by him to Packwood and that this transfer was in fraud of Smith's creditors.

In April 1959 Smith entered into a contract with the City of Turlock to demolish 12 buildings. By the terms of this contract Smith agreed to pay the city the sum of $1,452 and was to become the owner of "all materials composing buildings and other structures" to be demolished. The only

---

*Assigned by Chairman of Judicial Council.

compensation to Smith provided by the contract was the transfer to him of these materials to be salvaged. The contract required Smith to furnish the city a performance bond of $10,000. Smith and Packwood entered into a written contract under which Packwood delivered to the city his certified check for $10,000 in lieu of the performance bond and Smith agreed to pay Packwood $3,000 in equal installments on May 18 and June 4, 1959.

In August of 1959 Smith had demolished all but two of the buildings. At that time Smith had failed to pay the premium on his workmen's compensation insurance and the policy was cancelled. The city attorney notified Packwood that if Packwood did not make satisfactory arrangements to take over and complete the job, the city would terminate Smith's contract and complete the demolition itself and compensate itself for the costs thereof from Packwood's certified check which it held as a performance bond. On August 18, 1959, Smith signed the agreement upon which the findings of fraudulent conveyance are based. By this writing Smith hired Packwood as his foreman on the demolition job and agreed to pay Packwood $5.00 per hour for each hour devoted to said employment. Smith further transferred to Packwood all his right, title and interest in "all buildings, improvements and property acquired by him or to be acquired by him" under Smith's contract with the city and authorized Packwood to sell the salvaged property, to pay Smith's debts incurred in performing the contract with the city, and to pay himself the $3,000 owed to him under their first agreement.

Packwood thereupon undertook the supervision of the demolition of the two remaining buildings, devoting thereto 164 hours. Smith remained on the job and kept the time of the employees. Packwood sold salvaged brick and two salvaged steel beams for a total of $6,627 and paid therefrom to Smith's creditors, who had furnished labor and materials on the demolition job, $5,914.[1] The remaining $713 did not fully pay Packwood for his 164 hours devoted to supervising the work of demolition, which at the agreed rate of $5.00 per hour amounted to $820, and Packwood has received no part of the $3,000 agreed to be paid him for furnishing the performance bond.

For a clear understanding of the questions involved, it

---

[1]Included in this $5,914 was $500 paid to the City of Turlock for certain damages caused by the work of demolition and for some minor failures of complete performance.

must be noted that under Smith's contract with the city his title to the salvaged materials only vested in Smith at the time that each building was actually demolished. Smith bound himself by his contract with the city to demolish the buildings and could only claim the benefits of the contract as he performed the services agreed upon. It cannot be claimed that Smith owned the buildings before demolition. Under the express terms of his contract with the city, Smith agreed "to receive and accept the materials composing buildings and other structures . . . as his own, to keep and dispose of the same in whatever legal manner he sees fit. . . ."

It follows that if Packwood had not undertaken the completion of the contract and had permitted the city to terminate its contract with Smith, the material from the two undemolished buildings would never have become Smith's nor have become available to satisfy any of Smith's creditors, including plaintiff. Stated in another way, Packwood could only acquire title from Smith to the salvaged material from the two undemolished buildings under his August 18 contract with Smith by completing Smith's contract with the city to demolish these two buildings, and he could only demolish the two buildings by paying the cost of the labor and equipment required for such demolition. The plaintiff, if Smith himself had completed the contract, could only satisfy his debt out of the salvaged material after Smith had acquired title thereto, and Smith could only acquire title thereto when the material was taken from the buildings by their demolition. Since the plaintiff could not complain if Smith himself had paid for the cost of demolition out of the proceeds from the sale of the salvaged material, it is not easy to see how the plaintiff has been injured or can complain because Packwood, acting in place of Smith, paid for the cost of demolition of the same buildings out of the proceeds from such sales.

Plaintiff relies upon cases which hold that a fraudulent grantee is not entitled to reimbursement for outlays made in connection with the acquisition of property in fraud of creditors. (E.g., *Butler* v. *San Francisco Gas etc. Co.*, 168 Cal. 32 [141 P. 818] ; *Burke* v. *Koch*, 75 Cal. 356 [17 P. 228] ; *Swinford* v. *Rogers*, 23 Cal. 233; *Goodwin* v. *Hammond*, 13 Cal. 168 [73 Am.Dec. 574].) These cases do not touch the primary question here insofar as the materials sold may have come from the two undemolished buildings and the proceeds therefrom may have been used to pay the cost of their demolition. ▐▐▐ The City of Turlock had title to the

property until these buildings were demolished. For either Smith or Packwood to acquire that outstanding title the buildings had to be demolished. To demolish the buildings the cost of demolition had to be paid. Packwood, by paying the creditors who had furnished labor and equipment in the demolition, paid only the necessary expense of acquiring the city's title, not Smith's, and it could not be a fraud on Smith's creditors to acquire the city's title because his creditors could under no circumstances subject the city's title to the satisfaction of their claims against Smith.

A case nearly in point is *Ackerman* v. *Merle*, 137 Cal. 169 [69 P. 983]. In that case, a fraudulent grantee took property from the creditors which was subject to a mortgage. The fraudulent grantee paid off the mortgage and the court held that the fraudulent grantee was entitled to credit for this payment. The court said at page 171: "Their [the creditors of the fraudulent grantee] rights in the property are not enlarged or extended by the fraudulent transfer. They can get nothing for the mere sake of punishing the fraudulent grantee, and are entitled in equity only to have such interest in the property applied to the satisfaction of their claims as has been fraudulently conveyed away." The court quoted with approval from *Hamilton Nat. Bank* v. *Halstead*, 134 N.Y. 520 [31 N.E. 900, 30 Am.St.Rep. 693]: "If the fraud had not been consummated, only the value of the property in excess of the mortgage could have been made available in payment of the claims of the creditors. As to that interest secured by the mortgage, no wrong was done them." Equally, it would seem no property in the salvaged materials could have been acquired without incurring the cost of demolition of the buildings, and a similar principle seems applicable.

The evidence is completely silent as to whether (with the exception of the one lot of salvaged brick, hereinafter discussed, which Packwood received before the execution of his contract with Smith on August 18, 1959, and which was sold by Packwood for $754.67) any of the salvaged material sold by Packwood came from buildings other than the two which were razed under Packwood's supervision, or what amount of money was expended in the razing of these two buildings. These facts are material because Packwood, as we have seen, would clearly be entitled to set off against the amounts received by him from the sale of salvage from these two buildings the reasonable cost of razing them.

As to one lot of salvaged brick sold by Packwood

for $754.67, the testimony shows that this was transferred to Packwood and removed from the job-site by him with Smith's consent before August 18, 1959. Since this transaction antedated the alleged fraudulent conveyance of August 18 and was a separate consummated conveyance from Smith to Packwood, it properly should be excluded from the total of $6,627 received by Packwood from the total sales of salvaged materials under the August 18 contract. This would reduce the amount received by Packwood under the conveyance of August 18 (which was alone attacked and which the findings alone find to have been fraudulent) to $5,872.33.

With these facts in mind, we proceed to a consideration of the further points made by the parties.

The trial court found: That the conveyance of August 18 was made with the actual intent of Packwood to defraud Smith's creditors (Civ. Code, § 3439.07) ; without Smith receiving fair consideration from Packwood while Smith was insolvent (Civ. Code, § 3439.04) ; and without an immediate transfer of possession to Packwood (Civ. Code, § 3440).

Packwood denied any intention to defraud plaintiff or any of Smith's creditors, and the finding of an actual intent to defraud must be supported by circumstantial evidence, if at all. Section 3439.07 requires "actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors." Packwood was not informed of plaintiff's claim against Smith until after the conveyance to him of August 18. He knew, of course, that Smith was having difficulties in completing the particular demolition job on which he was engaged and had actually failed to pay his workmen's compensation insurance premiums which precipitated the city's threat to cancel his contract with the city ; but there could have been no actual intent to defraud Smith's creditors on the demolition job, who were the only creditors of Smith of whom Packwood is shown to have had any knowledge on August 18, 1959, when the conveyance to Packwood was made, because Packwood not only undertook to, but also actually did, pay the claims of all such creditors from the sale of the salvaged materials conveyed to him. Packwood had $10,000 of his own money at risk which the city was threatening to foreclose upon to complete the demolition work itself unless Packwood made an arrangement with Smith to complete this work which was satisfactory to the city. It is suggested by plaintiff that the court could infer that Packwood knew of the existence of other creditors either because he

must have realized Smith's difficult financial position from Smith's willingness to pay him $3,000 for furnishing a $10,000 performance bond, or because before furnishing the bond he must have inquired of Smith about his financial condition and learned of the existence of Smith's outstanding debts. It is also suggested that the speed with which Smith executed the conveyance to Packwood is a badge of fraud from which the actual intent to defraud may be inferred. ▉ While it is true that proof of fraud may, and must often be, made by circumstantial evidence (*Fross* v. *Wotton*, 3 Cal.2d 384, 393 [44 P.2d 350]), it remains true that actual fraud must be proved by clear and convincing evidence (*United States Fid. & Guar. Co.* v. *Postel*, 64 Cal.App.2d 567, 571 [149 P.2d 183]), and that "where the circumstances of the transfer comport equally with the theory of honesty and fair dealing, fraud will not be found." (*Hedden* v. *Waldeck*, 9 Cal.2d 631, 636 [72 P.2d 114].) ▉ The speed of the conveyance was natural in view of the fact that Smith was advised by the city that his contract would be cancelled unless he made an arrangement satisfactory with the city to complete the job, and that the proposed arrangement with Packwood was satisfactory to the city. No sinister inference can properly be drawn from the fact that Smith speedily acquiesced under these circumstances. The inference of actual knowledge of outstanding creditors of Smith from the circumstances surrounding the furnishing of the bond falls far short of the sort of proof required to establish actual fraud and rises no higher than mere surmise and conjecture.

Turning to the finding of Smith's insolvency, Civil Code, section 3439.02 provides: "A person is insolvent when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured." ▉ "Insolvency" is given in statutes and court decisions two distinct meanings: It may mean, as defined in section 3439.02, "the insufficiency of the entire property and assets of an individual to pay his debts," or it may mean that "even though the present fair salable value of his assets exceeds the amount of his debts, 'when he is unable to pay his debts from his own means as they become due.' " (*Gaspar* v. *United Milk Producers of Cal.*, 62 Cal.App.2d 546, 554 [144 P.2d 867] and cases cited.) As noted in *Gaspar* at page 555: "This confusion in the meaning to be given to the term 'insolvency' was one of the reasons for the drafting of the Uniform Fraudulent

Conveyance Act. (See Commissioners' Prefatory Note, 9 Uniform Laws Annot. 326.)'' While the evidence of Smith's current difficulties in the performance of the demolition contract with the City of Turlock might support a finding of his insolvency in the sense that he was unable to pay his debts as they came due, this fell short of proof that Smith was insolvent under the definition of the Uniform Fraudulent Conveyance Act which is set forth in section 3439.02 of our Civil Code above quoted. There was no proof offered of Smith's assets on August 18, 1959. The finding of his insolvency is therefore unsupported by the evidence. (*Miller* v. *Keegan*, 92 Cal.App.2d 846, 851-852 [207 P.2d 1073].) Civil Code, section 3439.04, requires both insolvency and the want of a fair consideration to render the transfer fraudulent. Thus the lack of evidence to support the finding of insolvency renders the finding of a lack of fair consideration unimportant. However, even disregarding the $3,000 owed to Packwood for furnishing the $10,000 bond, the sale of the material received under the transfer of August 18 netted only $5,872.33 and Packwood paid out to Smith's creditors more than that amount, $5,914. His $10,000 check was at stake and a transaction by which he netted nothing after paying Smith's creditors, except the salvaging of his $10,000 check, does not appear to bear any mark of unfairness. While Packwood retained $713 this was less than the $820 earned by Packwood for his services at $5.00 per hour under the August 18 agreement and there was no evidence that $5.00 per hour was not a reasonable compensation for those services. As hereinafter noticed this $713 was also less than the $754.67 received from the sale of brick transferred to Packwood by Smith before August 18, 1959.

 Civil Code, section 3440, provides: ''Every transfer of personal property . . . made by a person having at the time the possession or control of the property, and not accompanied by an immediate delivery followed by an actual and continued change of possession of the things transferred, is conclusively presumed fraudulent and void as against the transferor's creditors. . . .'' Packwood testified that, with the exception of the bricks previously referred to which he took from the job-site before August 18, 1959, and sold for $754.67, the rest of the salvaged material was left by him on the job-site until it was sold to third persons. As to any such material from buildings already demolished (and the record as noted does not show how much, if any, such material there was) to

satisfy section 3440 Packwood was under the duty to take immediate delivery and possession. As to the material in the two undemolished buildings as above pointed out, no title vested in Smith, and hence none could vest in Packwood until the material was removed from the buildings in course of demolition. By analogy to the cases involving the sale of growing crops, while no delivery and possession could, or need be, taken by Packwood until the materials were removed from the buildings, upon their being removed from the buildings it became his duty as against Smith's creditors to take immediate possession of them at that time. In the analogous situation of the sale of unharvested crops, it has been held that while section 3440 has no application to such crops until harvested, *immediate possession must be taken by the buyer to satisfy section 3440 when the crops are harvested.* (*O'Brien* v. *Ballou,* 116 Cal. 318, 321 [48 P. 130]; *Westcott* v. *Nixon,* 132 Cal.App. 490, 495 [23 P.2d 75].)

Since Smith was still on the job and Packwood was superintending the work for Smith in the performance of Smith's contract with the city, it appears that Smith's possession of the materials continued unchanged, and the failure of Packwood to take personal possession of the bricks supports the court's finding: ''That the transfer . . . by . . . Smith to . . . Packwood . . . was not accompanied by an immediate change of possession and control of the property involved.'' We note again that while this finding is supported as to the materials acquired by Packwood under the August 18 contract those materials as above pointed out were sold for $5,872.33, and the salvaged bricks of which Packwood took possession prior to August 18 and sold for $754.67 cannot properly be included. Thus this finding is only supported as to materials sold for $5,872.33 and not as to materials sold for $6,627 as found by the court.

The trial court gave judgment for $1,819.84, the full amount of plaintiff's claim, although admittedly Packwood paid out to Smith's creditors on the demolition job all but $713. Plaintiff attempts to justify this recovery on the ground that a fraudulent grantee is liable to the fraudulent grantor's creditors to the extent of any money which he may have received from the sale of the property fraudulently conveyed to him. The rule is not so broad as claimed by plaintiff. We have seen that in any event Packwood is entitled to credit in an indeterminate amount for the payments made by him for the actual cost of the demolition of the two buildings which were

demolished after he assumed supervision under the August 18 agreement with Smith. It is also the general rule, to which we subscribe, that where the transfer is only constructively fraudulent, and no actual fraud is involved, the grantee is entitled to credit for sums expended in paying other debts of the grantor. (*Adams* v. *Young,* 200 Mass. 588 [86 N.E. 942 and cases cited on pp. 943-944]; *Leqve* v. *Stoppel,* 64 Minn. 74 [66 N.W. 208, 212]; *New York Public Library* v. *Tilden,* 39 Misc. 169 [79 N.Y.S. 161, 171-172]; *Diamond Coal Co.* v. *Carter Dry-Goods Co.,* 20 Ky. L. R. 1444 [49 S.W. 438, 440]; see also 24 Am.Jur., pp. 276-277.) The rule is otherwise in the case of actual fraud. (37 C.J.S., p. 1119, n. 22.) This distinction between constructive and actual fraud was pointed out in the case of *Goodwin* v. *Hammond, supra,* 13 Cal. 168, 170, one of the cases relied upon by plaintiff. Under the terms of section 3439.07 above quoted, actual intent to defraud is distinguished from "intent presumed in law," and since the only finding of fraud supported by the evidence is failure to take immediate delivery and possession, such fact only raises a presumption of fraud, i.e., the fraud so established is constructive and not actual. In view of this fact Packwood is entitled to credit for the payments made by him to all creditors on the job including those whose claims did not depend on the demolition of the last two buildings. This view is supported by the rule that except in bankruptcy proceedings the preference of one creditor over another cannot be attacked. (See *United States Fid. & Guar. Co.* v. *Postel, supra,* 64 Cal.App.2d 567, 572.)

 The rule is settled, however, that the fraudulent grantee who has sold the property fraudulently conveyed to him is liable to the creditors of his grantor for the amount of the proceeds of such sale which he has converted to his own use. (*Pedro* v. *Soares,* 18 Cal.App.2d 600, 604 [64 P.2d 776]; see also *Hy-Lo Unit & Metal Products Co.* v. *Ryon,* 21 Cal.App.2d 38, 43 [68 P.2d 393].) This rule might support the money judgment to the extent of the $713 actually retained by Packwood except for the following facts: 1. Packwood actually earned for his services under the August 18 contract $840, which is in excess of the $713 which he retained. 2. Packwood actually received $754.67 from the sale of bricks of which he took and retained possession before the August 18 agreement, and as to which there is no showing of fraud, actual or constructive. Disregarding, as we must, this amount of $754.67, Packwood actually expended in the

payment of Smith's creditors $5,914 and actually received less than that amount, $5,872.33, from the sale of salvaged material received under the August 18 agreement.

Plaintiff further argues that the transfer of the material to be salvaged comes within the Bulk Sales Law. (Civ. Code, § 3440.1.) The trial court properly refused to so find. The sale of salvaged building material by a contractor engaged in the razing of buildings cannot be classified as the sale of "a stock in trade" within the meaning of this section. (See *Phillips* v. *Byers,* 189 Cal. 665, 668-672 [209 P. 557]; *Shasta Lumber Co.* v. *McCoy,* 85 Cal.App. 468, 472-473 [259 P. 965].)

The claim that the contract to pay Packwood $3,000 for the $10,000 deposit in lieu of bond was usurious adds nothing to plaintiff's case. Packwood has received no part of the $3,000 and usury does not affect the right to recover the principal which is all that Packwood has received, when his $10,000 check was returned by the city. (*Campbell* v. *Realty Title Co.,* 20 Cal.2d 195, 196-197 [124 P.2d 810].)

The judgment against the appellant Packwood is reversed.

Gibson, C. J., Traynor, J., Schauer, J., McComb, J., Peters, J., and White J. concurred.