GBG, INC., TRANSFEREE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
GBG, Inc. v. Commissioner
Docket No. 8839-78.
United States Tax Court
T.C. Memo 1981-729; 1981 Tax Ct. Memo LEXIS 9; 43 T.C.M. (CCH) 169; T.C.M. (RIA) 81729; December 28, 1981. Joseph H. Blackwell, for the petitioner. John P. Graham, for the respondent. EKMAN
MEMORANDUM FINDINGS OF FACT AND OPINION EKMAN, Judge: Respondent determined that petitioner was liable as a transferee *10 of Donald Peppers and Barbara Jean Peppers. The liabilities for income tax and additions to tax of Donald Peppers and Barbara Jean Peppers were litigated before this Court and a Memorandum Opinion deciding that case was filed today. See Docket No. 9175-78, Peppers v. Commissioner, T.C. Memo. 1981-728. The sole issue is whether petitioner is liable as a transferee for the unpaid taxes and additions to tax of the transferors. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, the first supplemental stipulation of facts, and attached exhibits are incorporated herein by this reference. GBG, Inc., petitioner, is an Ohio corporation with its office in Cleveland, Ohio, at the time it filed its petition herein. Petitioner was incorporated under the laws of Ohio on September 10, 1977. Kathleen Scali was the sole incorporator and Joseph H. Blackwell was petitioner's statutory agent at the time of its incorporation. Mr. Blackwell was also petitioner's sole director and secretary. Respondent determined the following deficiencies in income tax and additions to tax against petitioner as transferee of Donald Peppers *11 and Barbara Jean Peppers: [1]
Additions to Tax
Taxable Year
Deficiencies in
Under Sec. 6653(b)
Ending
Income Tax
for Donald Peppers
December 31, 1971
$ 3,491.30
$ 2,038.15
December 31, 1972
23,141.55
12,537.01
December 31, 1973
44,904.29
22,884.15
In an opinion filed today, we held that, with the exception of the inclusion of three bank accounts in the opening and closing net worth computations, respondent had correctly determined the increase in net worth and deficiencies in income tax for taxable years 1971, 1972, and 1973 and had sustained his burden of showing that part of the underpayment for each year was due to fraud. [2] *12 See Docket No. 9157-78, Peppers v. Commissioner, T.C. Memo. 1981-728. On or about August 10, 1977, Donald and Barbara Jean Peppers transferred to petitioner rental real property located at Quincy Avenue, Cleveland, Ohio, for the consideration of $ 10. Donald Peppers acted through a power of attorney [3] and the deed recording the transfer, prepared by Mr. Blackwell, was filed for record with Cuyahoga County Records on November 22, 1977. The value of the Quincy Avenue property as of August, 1977 was approximately $ 30,000. On or about August 30, 1977, Donald Peppers transferred to petitioner a 59 acre farm known as Maple Lakes Farm together with machinery and equipment for the consideration of $ 10. [4] Mr. Peppers again acted through a power of attorney and the deed recording the transfer, also prepared by Mr. Blackwell, was filed with the Lorain County Records on October 19, 1977. The value *13 of the Maple Lakes Farm as of August, 1977 was approximately $ 190,000. The Maple Lakes Farm was resold by petitioners for $ 220,000 on or about May 31, 1979 to Gregory and David Frantz. Prior to this resale, petitioner received an offer for the property dated February 17, 1978, made through Bishop Realtors in the amount of $ 100,000 contingent upon equity mortgage financing within 45 days of the offer. Mr. Blackwell rejected this offer because he thought that the price was unacceptable, that the contingency with respect to the financing made the contract illusory and was unnecessary, and that "the opening of an escrow within 180 days was entirely too long." Mr. Blackwell responded that he would recommend acceptance to the seller of an offer, in view of the urgency to dispose of the property, in the amount of $ 190,000, $ 85,000 less than the listed $ 275,000 price, coupled with a committed opening of escrow within 30 days and elimination of the financing contingency. *14 During August, 1977 there was a first mortgage indebtedness on Maple Lakes Farm to Quincy Savings and Loan in the amount of $ 56,788.56. The deed recording the transfer of the property to petitioner was subject thereto. This mortgage, dated August 23, 1972, was originally in the amount of $ 47,000. The record contains no explanation of the increase from 1972 to 1977. Petitioner made no payments on this mortgage during the period it held the property. The following balance sheet sets forth the assets and liabilities of Donald and Barbara Jean Peppers as of May 1, 1977: ASSETS
Current assets: Cash on hand and in bank
$ 1,000
Accounts receivable - law practice
1,500
Total current assets
$ 2,500
Fixed assets: Thoroughbred horses - 24
99,500
Horse van
8,500
House - Farm - Maple Lake Farm
10,000
Land
51,000
Old barn
20,000
New barn
105,350
Garage
5,000
Horse Walker
1,800
Starting gate
4,000
Miscellaneous tools
5,000
Pick-up truck
900
Personal residence - 3731 Beacon Drive
29,500
Rental property - 1524 E. 123rd Street
7,000
Total fixed assets
347,550
Other assets: Lamborghini - 1971
16,223
Personal property
10,000
Total other assets
26,223
$ 376,270
*15 LIABILITIES AND NET WORTH
Current liabilities: Accounts payable
$ 62,894
Note payable - Robert Stone
30,000
Note payable - Quincy Money Exchange
20,000
Note payable - Quincy Savings and Loan - home
10,778
Note payable - Quincy Savings and Loan - farm
43,007
Note payable - Prudential Insurance
11,000
Total current liabilities
$ 177,679
Other liabilities: Accumulated depreciation - auto
4,524
Accumulated depreciation - horses
48,000
Accumulated depreciation - farm
25,434
Accumulated depreciation - rental property
2,140
Total other liabilities
80,098
Net worth
118,496
$ 376,273
The parties apparently do not dispute the accuracy of these figures as of May 1, 1977. Omitted from the balance sheet were "personal and other liabilities" in the amount of $ 71,593.82, [5] a mortgage on the Holyrood property in the amount of $ 3,000 to $ 4,000 and a mortgage on the Quincy Avenue property in the amount of $ 11,000. [6]
*16 A Certificate of Judgment was filed on March 7, 1977, with the Court of Common Pleas, Lorain County, Ohio, in respect of an earlier judgment obtained on or about November 16, 1976, by Cleveland Electric Illuminating Company against Quincy Money Exchange, Inc. and Mr. Peppers in the amount of $ 4,818 with interest at 6 percent from November 16, 1976, plus court costs of $ 35.35. Petitioner settled this judgment lien with ClevelandElectric Illuminating Company on or about September 7, 1979, for the sum of $ 3,500. Sun Oil Company obtained a judgment against Mr. Peppers on or about April 3, 1977, in the amount of $ 1,231.83. A certificate of this judgment was filed with the Court of Common Pleas, Lorain County, Ohio, in the original amount of $ 1,231.83 with interest at 6 percent from April 4, 1977, plus court costs of $ 16.50. Petitioner settled the judgment lien with Sun Oil Company for $ 898.47 on or about September 7, 1979. The Euclid National Bank, Installment Loan Division, obtained a judgment against Mr. Peppers in the amount of $ 5,232.47 on or about December 29, 1976. A certificate of this judgment was filed with the Court of Common Pleas, Lorain County, Ohio, in *17 the original amount of $ 5,232.47 with interest at 6 percent from December 30, 1976, and court costs in the amount of $ 20.75. Petitioner settled this judgment lien with Euclid National Bank for $ 6,075.97 on or about September 7, 1979. Real estate taxes with respect to Maple Lakes Farm for the year 1976 accrued in the amount of $ 2,174.96 plus penalty, and became a lien against Maple Lakes Farm at least by July 1, 1977. As of September 21, 1977, the real estate taxes for the year 1977 were a lien with respect to Maple Lakes Farm but were not yet due and payable. [7]
A Bureau of Workmen's Compensation application was filed on behalf of James Barker for injuries allegedly sustained in an accident during his employment at Maple Lakes Farm on July 26, 1974. The claimant's application *18 was for an undetermined amount. The claim had not been heard, determined or otherwise processed as of the date of the stipulation herein and no allowance was made for this claim in the sale of Maple Lakes Farm. A similar application was filed on behalf of Susan H. Chase for injuries allegedly sustained during an accident at Maple Lakes Farm on October 28, 1976. This claimant's application was in respect of $ 800 in medical expenses not paid by the employer, listed as Mr. Peppers, and again, as of the date of stipulation, the claim had not been heard, determined or otherwise processed. During August, 1977, the month in which the Quincy Avenue property and the Maple Lakes Farm were transferred from Donald and Barbara Jean Peppers to petitioner, the first mortgage indebtedness with respect to the Maple Lakes Farm was $ 13,781.56 more than the amount listed on the balance sheet as of May 1, 1977 ($ 56,788.56 less listed $ 43,077) and the "cash on hand and in bank" listed on the balance sheet in the amount of $ 1,000 and the "accounts receivable in law practice" listed on the balance sheet in the amount of $ 1,500 were no longer available to Donald and Barbara Jean Peppers. *19 As early as June 22, 1976, Donald Peppers, Carl Character, Mr. Peppers' attorney, and Mr. Blackwell, Mr. Peppers' former attorney and attorney for petitioner, knew that the District Director of Internal Revenue Service at Cleveland, Ohio, was proposing additional tax liabilities against Donald and Barbara Jean Peppers for the years 1971, 1972, and 1973 in the total amount of $ 141,100. Mr. Peppers did not own any interest in petitioner. He believed that he was insolvent during August of 1977 and that the transfers of Maple Lakes Farm and Quincy Avenue property to petitioner rendered him "almost bankrupt". OPINION Section 6901(a) provides a method of collection of income taxes from a transferee of property who is liable, at law or in equity, for the indebtedness of the transferor.[8] It does not create a separate liability; it merely provides a secondary method for enforcing the existing liability of the transferor. C.B.C. Super Markets, Inc. v. Commissioner, 54 T.C. 882, 898 (1970). Whether a transferee is liable for the transferor's indebtedness is determined under *20 state law. Commissioner v. Stern, 357 U.S. 39 (1958); Pierce v. Commissioner, 61 T.C. 424, 432 (1974). Section 6902 provides that in cases before this Court the burden is upon respondent to show that the petitioner is liable as a transferee of property of taxpayer but not to show that the taxpayer was liable for the tax. *21 The Uniform Fraudulent Conveyance Act was adopted in Ohio in 1961 and is now found at Ohio Rev. Code Ann. sections 1336.01 through 1336.12 (Anderson 1979). See 7A Uniform Laws Ann. 161 (Master Ed. 1978). Respondent proffers three sections of the Act, sections 1336.04, 1336.06, and 1336.07, in support of his contention that the conveyances to petitioner were fraudulent and accordingly that petitioner is liable for the transferor's indebtedness. [9] After careful examination of the record, we find that petitioner is liable as a transferee by operation of those sections. Ohio Rev. Code Ann. section 1336.04 (Anderson 1979) provides that: Every conveyance made and every obligation incurred *22 by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration. Respondent contends that the transferors were insolvent or, in the alternative, were rendered insolvent by their transfers to petitioner, that the transfers were without fair consideration and that thus the fraudulent intent is proven. Petitioner disagrees. Petitioner first contends that the transferors were not insolvent or rendered insolvent by the transfers in question. Although the record is painfully unclear as to which liabilities were included in the balance sheet, which liabilities were included in the amorphous category of "personal liabilities and other liabilities", and indeed whether certain liabilities were included at all, we find that the transferors were rendered insolvent by the transfers in question even if we view these liabilities in a light most favorable to petitioner. [10]
*23 Donald and Barbara Jean Pappers determined that they had assets in the amount of $ 347,550 and liabilities in the amount of $ 177,679 as of May 1, 1977. Mr. Peppers testified that this list did not include liabilities in the amount of $ 71,593.82, a liability for an outstanding mortgage on the Holyrood property in the amount of $ 3,000 to $ 4,000, and a liability for an outstanding mortgage on the Quincy Avenue property in the amount of $ 11,000. As of August, 1977, the month in which the transfers were made to petitioner, the "cash on hand and in bank" and the "accounts receivable - law practice" were no longer available to the transferors thus reducing assets by $ 2,500 and the first mortgage indebtedness with Quincy Avenue Savings and Loan was outstanding for $ 13,781.56 more than the listed liability of $ 43,007. The deficiencies in taxes and additions to tax due from Donald and Barbara Jean Peppers, computed in accordance with our findings in T.C. Memo 1981-728, are additional liabilities which are to be considered in determining whether the transferors were solvent. Kreps v. Commissioner, 351 F.2d 1 (2d Cir. 1965), affg. 42 T.C. 660 (1964), *24 C.B.C. Super Markets, Inc. v. Commissioner, supra at 899. While the exact amount will have to await the computations under Rule 155, Tax Court Rules of Practice and Procedure, we are satisfied that it will be not less than $ 100,000, exclusive of interest. The Quincy Avenue property was not included in the balance sheet and the parties disagree as to its value for purposes of determining insolvency as well as for other purposes. Similarly, although the Maple Lakes Farm was included in the balance sheet, its value is disputed for other purposes. [11]
Petitioner contends that the value of the Quincy Avenue property was $ 11,000 and submitted the report of a real estate broker, dated April 29, 1980, in support thereof. This report emphasized the lack of available financing, the vacant and vandalized buildings in the area, and the social conditions in the *25 area so as to make "it impossible for any business to survive and prosper." Respondent submitted the report of an engineer in support of his contention that the value of the Quincy Avenue property at the time of the transfer was far in excess of $ 11,000. The engineer emphasized in his report the comparable sales in the area, the improvements, and the condition of the property at the time of his inspection and determined that the value was in the $ 45,000 to $ 65,000 range during August, 1977. Valuation is a subjective process, incapable of mathematical precision, which requires the exercise of our best judgment under all the circumstances. Messing v. Commissioner, 48 T.C. 502, 512 (1967). Respondent's report emphasized comparable sales of residential properties in the area and offered only a broad range of values. Petitioner's report emphasized lack of adequate financing in, as stated in the report, "today's market", i.e., lack of adequate financing and social conditions as they existed as of the date the report was prepared and not as of the date of the transfer to petitioner. No comparable sales in the area were used in this report because the only *26 sales in the area were residential which were viewed as not comparable. Based upon our examination of these reports as well as the balance of the record, we determine that the fair market value of the Quincy Avenue property on the date of transfer to petitioner was $ 30,000. Respondent contends that the fair market value of the Maple Lakes Farm was $ 220,000 during August, 1977 and has submitted the report of an engineer in support thereof. This report was based upon inspection of the property, the listed selling price of $ 275,000 and the actual selling price during September, 1979, for $ 220,000. Petitioner contends that the fair market value during August, 1977 was less than $ 220,000 and in support of this contention points to the offer received through Bishop Realtors in the amount of $ 100,000, the counter offer made for $ 190,000 and the report of another relator, J. Howard Battle, that the "best price obtainable" for the property was $ 169,000. Respondent's report relies too heavily upon a selling price determined approximately 21 months after the transfer to petitioner. On the other hand, the property was listed at a price of $ 275,000 and Mr. Blackwell was willing *27 to accept $ 190,000. Furthermore, the Maple Lakes Farm was listed in the balance sheet at a value of at least $ 202,150. Based upon our examination of the entire record, we find that the fair market value of Maple Lakes Farm was $ 190,000 on the date it was transferred to petitioner. Employing the foregoing values and adjustments, it appears that the transferors had assets in the amount of $ 391,623 and liabilities in the amount of $ 377,055.38 immediately prior to the transfer. [12] Our analysis of the present fair salable value of the assets reveals that the transferors at that time were, to say the least, close to being unable to pay their debts as they became due and thus close to insolvency. However, since they received only $ 10 for the Maple Lakes Farm and $ 10 for the Quincy Avenue property, it is apparent that they would not be able to meet their obligations as they matured and that the transfers, therefore, clearly rendered them insolvent even if the liabilities connected with the properties were assumed. [13] *28 See Cellar Lumber Co. v. Holley, 9 Ohio App.2d 288, 224 N.E.2d 360 (1967). Petitioner next contends that it paid, and the transferors received, fair consideration for the Quincy Avenue property and for the Maple Lakes Farm. Once again, we cannot agree. Ohio Rev. Code Ann. section 1336.03 (Anderson 1979) provides that: Fair consideration is given for property, or obligation: (A) When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied; or (B) When such property or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property or obligation obtained. Petitioner contends generally that it paid fair consideration for both properties but more specifically contends with respect *29 to the Maple Lakes Farm that the amount paid was fair in light of the outstanding and delinquent mortgages, liens, encumbrances, and indeterminate liability in connection with injuries sustained by employees on the property. The transferors received $ 10 from petitioner for the Maple Lakes Farm and petitioner received the property for $ 220,000. Even assuming that petitioner received the property from the transferors subject to all liabilities, related thereto, including the mortgage, there is still a great disparity between the amount received by the transferors and the amount received by petitioner. Mr. Blackwell rejected the offer of $ 100,000 as unacceptable and countered with a proposed price of $ 190,000, $ 85,000 less than the listed $ 275,000. Thus, if the property was transferred subject to the outstanding mortgage of $ 56,788.56, the liability owed Sun Oil Company in the amount of $ 1,231.83 plus interest plus court costs of $ 16.50, the liability owed ClevelandElectric Illuminating in the amount of $ 4,818 plus interest plus court costs of $ 35.35, the liability owed Euclid National Bank in the amount of $ 5,232.47 plus interest plus court costs of $ 20.75, and the *30 liability with respect to real estate taxes in the amount of $ 2,174.96 plus penalty, the amount realized by the transferors on the transfer to petitioner was still over $ 25,000 less than the price rejected as unacceptable 5 months later, over $ 115,000 less than the price counteroffered, over $ 200,000 less than the price listed, and over $ 115,000 less than the value we have found. Accordingly, the transferors did not receive fair consideration within the meaning of Ohio Rev. Code Ann. sections 1336.03 and 1336.04 (Anderson 1979) upon the transfer to petitioner of the Maple Lakes Farm. See Squire v. Cramer, 64 Ohio App. 169, 28 N.E.2d 516 (1940), cf. Berndt v. Berndt, 192 Misc. 57, 79 N.Y.S.2d 143 (Sup. Ct. Onondaga County 1948). The transferors also received $ 10 for the transfer of the Quincy Avenue property to petitioner. Thus, assuming that petitioner received the property subject to the outstanding mortgage, there is still a great disparity between the value of the property, $ 30,000, and the amount realized, $ 10 plus the mortgage liability of $ 11,000. Accordingly, the transferors did not receive fair consideration within the meaning *31 of Ohio Rev. Code Ann. sections 1336.03 and 1336.04 (Anderson 1979) upon the transfer of the Quincy Avenue property to petitioner. See Squire v. Cramer, supra, cf. Berndt v. Berndt, supra.
In addition to the foregoing, petitioner would also be liable as a transferee by operation of Ohio Rev. Code Ann. section 1336.06 (Anderson 1979) which provides that: Every conveyance made and every obligation incurred without fair consideration, when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors. We see no reason to repeat our discussion of fair consideration and insolvency. We point out, however, that Mr. Peppers testified that he was insolvent during August, 1977 and that the transfers rendered him almost bankrupt. Mr. Peppers apparently belived that he had incurred or would incur debts and not be able to pay them when they became due, especially when the proposed tax liabilities are considered. Finally, petitioner is also liable as a transferee by operation of Ohio Rev. Code Ann. *32 section 1336.07 (Anderson 1979) which provides that: Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present or future creditors. Mr. Peppers believed he was insolvent. He, as well as Mr. Blackwell, knew that the District Director of Internal Revenue Service at Cleveland, Ohio was proposing additional tax liabilities in the total amount of $ 141,100 for years 1971, 1972, and 1973. The transfers were made to petitioner, a corporation, for inadequate consideration. Mr. Blackwell acted as petitioner's statutory agent at the time of its incorporation as well as its sole director and its secretary. Although under this section knowledge of the intent of the transferee is immaterial, see Ursak v. Sivanick, 56 Ohio App. 434, 10 N.E.2d 1017 (1937); Inre Wright Industries, 93 F. Supp. 58 (N.D. Ohio 1950), it is apparent that the transferors and petitioner acted in a way to insulate the assets from the claims of the United States. Accordingly, we find that the conveyances of the Maple Lakes *33 Farm and the Quincy Avenue property to petitioner were made to hinder, delay, or defraud present or future creditors, one of which was the United States and that the conveyances were fraudulent. Accordingly, petitioner is liable as a transferee for the unpaid taxes and additions to tax of Donald and Barbara Jean Peppers, transferors. Decision will be entered under Rule 155. Footnotes
1. Respondent determined that these amounts, "plus interest as provided by law, are your liability as a transferee of assets of Donald and Barbara Jean Peppers for deficiencies of income tax and additions to tax due from Donald and Barbara Jean Peppers." The deficiencies and additions to tax were assessed both against Donald and Barbara Jean Peppers and against petitioner on March 30, 1978, by jeopardy assessments in the amounts of $ 71,537.14 in income tax and $ 37,459.31 as additions to tax under section 6653(b).↩
2. The exact amount of deficiencies and additions to tax, in accordance with our findings, awaits the computations under Rule 155, Tax Court Rules of Practice and Procedure.↩
3. Phyllis Green signed as attorney for Donald Peppers under the power of attorney.↩
4. Included in this transfer were the house, land, old barn, new barn, garage, horse walker, starting gate, and miscellaneous tools, all of which will hereinafter be referred to as the Maple Lakes Farm.↩
5. It is unclear from the record what these liabilities pertain to. At one point during the trial they are referred to as "personal and other liabilities" and at another point, as the liabilities on the Maple Lakes Farm and Mr. Peppers' own personal liabilities as an attorney. ↩
6. The balance sheet as contained in the record does not include the Quincy Avenue property or the Holyrood property.↩
7. Again, it is unclear from the record whether these liens, i.e., the liens with respect to the judgments of Cleveland Electric Illuminating Company, Sun Oil Company, Euclid National Bank, and for the real estate taxes, were included in the balance sheet or in the $ 71,593.83 figure referred to at trial as the amount of "personal liabilities and other liabilities", or were not included in either.↩
8. SEC. 6901. TRANSFERRED ASSETS. (a) Method of Collection.--The amounts of the following liabilities shall, except as hereinafter in this section provided, be assessed, paid, and collected in the same manner and subject to the same provisions and limitations as in the case of the taxes with respect to which the liabilities were incurred: (1) Income, estate and gift taxes.-- (A) Transferees.--The liability, at law or in equity, of a transferee of property-- (i) of a taxpayer in the case of a tax imposed by subtitle A (relating to income taxes), (ii) of a decedent in the case of a tax imposed by chapter 11 (relating to estate taxes), or (iii) of a donor in the case of a tax imposed by chapter 12 (relating to gift taxes), in respect of the tax imposed by subtitle A or B. (B) Fiduciaries.--The liability of a fiduciary under section 3467 of the Revised Statutes (31 U.S.C. 192) in respect of the payment of any tax described in subparagraph (A) from the estate of the taxpayer, the decedent, or the donor, as the case may be. (2) Other taxes.--The liability, at law or in equity of a transferee of property of any person liable in respect of any tax imposed by this title (other than a tax imposed by subtitle A or B), but only if such liability arises on the liquidation of a partnership or corporation, or on a reorganization within the meaning of section 368(a)↩.
9. See Bradford v. Beyer, 17 Ohio St. 388 (1867); see generally Ohio Rev. Code Ann. secs. 1309 and 1310 (Anderson 1979), 24 Ohio Jur. 3rd, Creditors' Rights and Remedies, sec. 855 et seq. (1980); cf. Dillman v. Commissioner, 64 T.C. 797 (1975), Aggregates Associated, Inc. v. Packwood, 58 Cal.2d 580, 375 P.2d 425, 431, 25 Cal. Rptr. 545, 551↩ (1962).
10. Ohio Rev. Code Ann. sec. 1336.02 (Anderson 1979) provides that: A person is insolvent when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured. See also Kreps v. Commissioner, 351 F.2d 1 (2d Cir. 1965), affg. 42 T.C. 660 (1964), and C.B.C. Super Markets, Inc. v. Commissioner, 54 T.C. 882, 899 (1970) (which refers to this as the "bankruptcy test" for insolvency) but see Cellar Lumber Co. v. Holley, 9 Ohio App.2d 288, 224 N.E.2d 360, 363↩ (1967) (which refers to this as the "equitable test" for insolvency).
11. We note that to be consistent, we must determine the value of the properties initially without consideration of the mortgages and liens because those mortgages and liens have already been included as "liabilities" either on the balance sheet or in the "personal liabilities and other liabilities".↩
12. The figures listed on the balance sheet appear to be only book values but the parties apparently choose to accept them as the value of the properties. ↩
Assets
$ 190,000
Maple Lakes Farm
30,000
Quincy Avenue Realty
99,500
Thoroughbred horses
8,500
Horse van
29,500
Personal residence
7,000
Rental property
900
Pick-up truck
26,223
Other assets
$ 391,623
Liabilities
$ 71,593.82
personal liabilities and other liabilities
56,788.56
Outstanding mortgage - Maple Lakes Farm
3,000.00
Outstanding mortgage - Holyrood prop.
11,000.00
Outstanding mortgage - Quincy Ave. prop.
62,894.00
Account payable
30,000.00
Note payable - Robert Stone
20,000.00
Note payable - Quincy Money Exchange
10,778.00
Note payable - Quincy Savings & Loan (home)
11,000.00
Prudential Insurance
$ 277,054.38
+100,000.00
Estimated income tax deficiencies and
$ 377,054.38
additions to tax
13. Assets
$ 99,500
Thoroughbred horses
8,500
Horse van
29,500
Personal residence
7,000
Rental property
900
Pick-up truck
26,223
Other assets
$ 171,623
Liabilities
$ 71,593.82
Personal and other liabilities
3,000.00
Outstanding mortgage - Holyrood prop.
62,894.00
Accounts payable
30,000.00
Note payable - Robert Stone
20,000.00
Note payable - Quincy Money Exchange
10,778.00
Note payable - Quincy Savings & Loan
(home)
11,000.00
Prudential Insurance
$ 209,265.82
+100,000.00
Estimated income tax deficiencies and
Subject to a reduction of approximately $ 15,000 if indeed the Maple Lakes Farm was transferred subject to those liabilities referred to in footnote 7, supra, and if those liabilities were originally included in the balance sheet of May 1, 1977 or in the $ 71,593.83 figure.
*↩ $ 309,265.82
additions to tax