HELEN STELLA ELIZALDE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Elizalde v. Commissioner
Docket No. 10599-79.
United States Tax Court
T.C. Memo 1984-243; 1984 Tax Ct. Memo LEXIS 430; 48 T.C.M. (CCH) 28; T.C.M. (RIA) 84243; May 7, 1984. Michael A. Brush, for the petitioner. Marc J. Winter, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent has determined that petitioner is liable as a transferee of assets for a deficiency in her father's 1972 Federal income tax and an addition to tax totalling $28,348.95, plus interest as provided by law. The issues for decision are (1) whether the statute of limitations, section 6901(c), [1] precludes respondent's collection of taxes from petitioner as a transferee, and (2) whether and to what extent petitioner is liable as a transferee within the meaning of section 6901. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioner resided in West Covina, California, at *433 the time she filed her petition in this case. Her parents, Daniel Soto Elizalde (Daniel) and Mary Monica Elizalde (Mary), were married in 1945. Since at least 1966, Mary has suffered from a nervous disorder for which she has been receiving medical treatment and medication. As of 1970, her condition had deteriorated to such extent that she was unable to undertake any gainful employment. This condition persisted through all times relevant to this case. In 1971, after having attained her majority and having been on her own for some time, petitioner resumed living with her parents in a unit of an apartment complex in Alhambra, California, that Daniel and Mary owned (the Alhambra property). On December 13, 1971, Daniel purchased by grant deed a house and lot on South Evanwood in West Covina, Los Angeles County, California (the Evanwood property). The grant deed was recorded, and it recited that the conveyance had been made to Daniel "a married man, as his sole and separate property." The purchase price for the Evanwood property was approximately $27,000 and was secured by a deed of trust. Until sometime in 1973, Daniel made all of the payments on the indebtedness secured by that *434 deed of trust. The record does not establish the source of funds from which Daniel made these payments or the source of funds for the down payment on the Evanwood property. Mary herself made no payments on the Evanwood property. Between 1971 and 1973, Daniel lived with Mary and petitioner at the Alhambra property on an off-and-on basis. When not at the Alhambra property with Mary and petitioner, he resided at the Evanwood property with another woman. Daniel came to and went from the Alhambra property as he pleased, with no regular pattern of absences. At no time did Daniel and Mary ever formally separate or divorce, and they were still married at the time of the trial of this case. On April 8, 1972, Daniel was arrested by officers of the Los Angeles Police Department on a criminal charge of narcotics trafficking. He was subsequently tried, convicted, and sentenced to prison. Daniel began his prison term sometime in 1973, and he was released from prison shortly before Thanksgiving in 1976. On April 10, 1972, two days after Daniel's arrest, the Internal Revenue Service (IRS) made a determination pursuant to section 6851 to terminate Daniel's taxable year 1972 for the period *435 from January 1, 1972 through April 8, 1972, and made an assessment in the amount of $443,840. Pursuant to this jeopardy termination and assessment, [2] the IRS served notices of levy on Daniel's various bank accounts, which resulted in collections and credits to Daniel's tax account in the following amounts: Date of Levy
Amount Collected
April 14, 1972
$ 949.97
April 17, 1972
2,987.00
April 18, 1972
1,419.31
April 27, 1972
8,844.19
Total
[3] $14,200.55
On April 8, 1972, the day of Daniel's arrest, respondent had also seized $105,640.48 in cash from Daniel's safety deposit box. The IRS also issued *436 and filed with the Los Angeles County Recorder three Notices of Federal Tax Lien, as follows: Date Issued
Date Filed
Name
Amount
April 10, 1972
April 10, 1972
Daniel Elizalde
$443,840.00
n4April 26, 1972 [4]April 27, 1972 Daniel S. Elizalde
443,840.00
n4August 9, 1972 [4]August 9, 1972 Daniel S. Elizalde
[5] 429,639.45
& Mary M. Elizalde
Only the second notice of lien, dated April 26, 1972 and filed April 27, 1972, specifically identified property to which the lien was to attach. This second notice identified real property owned by Daniel and Mary, but the legal description of this property was not the same as that of either the Alhambra property or the Evanwood property. Daniel *437 testified that he owned a third piece of realty identified as the Pico Rivera property. Daniel was aware in 1972 that these lien notices had been filed in his name. Prior to his arrest in 1972, Daniel had provided adequate support for Mary. After his arrest and before his incarceration in 1973, Daniel tried to provide what support for Mary he could afford although it was very little. Daniel provided no support for Mary while he was in prison. On June 27, 1972, Daniel conveyed to Mary by quitclaim deed his interest in the Alhambra property. Mary resided at the Alhambra property prior to Daniel's arrest, during Daniel's incarceration, and up until the beginning of 1977, when she was forced to move to the Evanwood property. Daniel's arrest and Mary's discovery of Daniel's marital infidelity worsened Mary's physical and emotional health during 1972. Because Mary was unable to work and because Daniel was no longer supporting Mary, petitioner began supporting Mary. Between Daniel's arrest in April of 1972 and his release from prison in November of 1976, petitioner paid for most of Mary's support, including food, clothing, medical expenses and medication, utilities, transportation, *438 and other expenses. Mary also received food stamps during parts of 1972 and 1973, and she received state provided medical assistance during parts of 1973 and 1974. Petitioner's younger brother and sister were married and had families and their own households to support. They did help petitioner to a very limited extent to support Mary when petitioner was unable to do so alone. Petitioner worked several different jobs and held part-time jobs in addition to any regular employment she secured. Her total payments to support Mary averaged between $3,600 and $4,000 a year from 1972 through 1976. Petitioner provided no support for Mary before Daniel's arrest in April of 1972. While he was in prison, Daniel made no payments on the trust deed loans on the Alhambra and Evanwood properties. Petitioner collected rentals from the other units at the Alhambra property and used those rentals to make the monthly loan payments. Petitioner used all of the rentals to pay the monthly installments, and those funds were insufficient to meet the mortgage and other expenses of the property. In late 1976, the lenders foreclosed on the Alhambra property, forcing petitioner and Mary to move out in *439 January of 1977. While Daniel was in prison, his paramour had rented the Evanwood property to third parties and had used the rentals to pay the installments on the deed of trust indebtedness on that property. Around November 20, 1976, about a week before Thanksgiving, Daniel was released from prison and resumed living with Mary and petitioner at the Alhambra property. At this time, the Alhambra property was being foreclosed upon and Mary and petitioner were, in fact, paying rent to the lenders in order to remain there temporarily. On November 29, 1976, respondent released to Daniel's attorneys the $105,640.48 in cash that the IRS had seized from Daniel's safety deposit box on April 8, 1972, the day Daniel was arrested. On December 15, 1976, Daniel executed a grant deed conveying the Evanwood property to petitioner. This grant deed was recorded and recited that the conveyance was made by Daniel, "a married man as his sole and separate property." On February 25, 1977, Daniel again executed a grant deed, recorded the same day, again conveying the Evanwood property to petitioner. This grant deed did not characterize Daniel's transfer as either his sole and separate property *440 or his interest in community property. Also on February 25, 1977, Mary executed a quitclaim deed, recorded the same day, conveying to petitioner any interest that Mary had in the Evanwood property. This quitclaim deed did not characterize the transfer as either her sole and separate property or her interest in community property. This second conveyance by both Daniel and Mary was done on advice of counsel in case Mary should be found to have a community property interest in the Evanwood property. As of December 1976, the amount of indebtedness due on the loan secured by the first deed of trust on the Evanwood property totalled $9,581.53. In December of 1976, around the time of Daniel's first grant deed to petitioner of the Evanwood property, Daniel, Mary, and petitioner were still living at the Alhambra property. At that time, Daniel was aware of the foreclosure on the Alhambra property. Daniel also was aware that ever since his arrest, petitioner had been largely supporting Mary. He also realized the financial and emotional harm he had caused Mary through his criminal activities and his marital infidelity. Thus, Daniel had several purposes in conveying the Evanwood property *441 to petitioner. First, even though petitioner did not demand or expect to be repaid for her expenditures for Mary's support, nonetheless, Daniel, recognizing that petitioner had fulfilled his own obligation to support Mary, intended the transfer as reimbursement or compensation for petitioner's support of Mary. Second, realizing his obligation to support Mary in the future, Daniel intended the transfer to help assure that Mary would continue at least to "have a roof over her head." Finally, Daniel was advised by his attorneys that, in the event of divorce proceedings, which he was then at least considering, a court would find the Evanwood property to be the community property of Daniel and Mary. Daniel made the transfer because he felt he "owed" it to Mary and petitioner and because he felt he would, in any event, "lose" one-half of the Evanwood property to Mary. Daniel transferred the property to petitioner rather than to Mary because both Daniel and petitioner believed Mary, while not legally incompetent, was incapable of managing her financial affairs because of her medical and emotional condition. The subsequent deeds from Daniel and Mary on February 25, 1977 reflected the *442 continuing view of Daniel and his attorneys of Mary's potential community property interest in the Evanwood property as well as Daniel's and petitioner's view that Mary was incapable of managing her finances and property. When he executed both deeds, Daniel was aware that Tax Court proceeding concerning his 1972 income tax liability was still pending (see page 11, infra ). Before executing the first grant deed, dated December 15, 1976, Daniel went to the Los Angeles County Recorder's Office and attempted to perform a title search to discover whether a tax lien had been filed against the Evanwood property or whether the Evanwood property had been levied upon by the IRS. Although he had never before performed a title search, Daniel told employees of the Recorder's Office what he was looking for and those employees aided Daniel in his search. Daniel did not discover a tax lien or levy against the Evanwood property. Daniel did not believe that there was a valid tax lien or levy against the Evanwood property, that the IRS was interested in the property as a source of payment for his uncollected 1972 tax liability, or that the property would have to be sold to pay those taxes. *443 Between his release from prison in November of 1976 and March of 1977, Daniel made several payments on the promissory note secured by a deed of trust on the Evanwood property. The record does not establish the source of these payments. Although he resided with petitioner and Mary during this period of time, Daniel provided no other support for them. After the foreclosure on the Alhambra property in December of 1976, Daniel moved with petitioner and Mary into the Evanwood property. Sometime around March of 1977, Daniel permanently left the Evanwood residence. About the same time, petitioner began making the monthly payments on the promissory note secured by a deed of trust on the Evanwood property. Petitioner has made these payments ever since. Daniel and Mary have not cohabited since March of 1977. Since March of 1977, petitioner has continued to support Mary. On August 24, 1973, Daniel and Mary had filed a joint income tax return for the taxable year 1972 showing a total tax due of $163. On this return, Daniel and Mary filed an attachment stating that Daniel had received an unspecified amount of gross receipts during 1972, designated as "miscellaneous income." Daniel *444 declined to identify the source of this income, instead asserting his Fifth Amendment privilege against self-incrimination. Finally, the attachment stated that the money seized from Daniel's safety deposit box, although the object of litigation in the local United States District Court at that time, had been assigned to Daniel's attorney for deductible attorneys' fees more than offsetting the unidentified "miscellaneous income." On April 19, 1974, respondent issued to Daniel and Mary a statutory notice of deficiency with respect to the prior jeopardy termination and assessment for 1972. Daniel and Mary filed a timely petition with this Court (docket No. 4205-74), requesting a redetermination of that deficiency. On March 16, 1977, this Court entered a Stipulated Decision in docket No. 4205-74 pursuant to a settlement of the issues by Daniel, Mary, and respondent. The Stipulated Decision provided that Daniel was liable for a deficiency in income tax for the taxable year 1972 of $28,664, plus an addition to tax pursuant to section 6651(a) $3,616. [6] Thus, after credit for the prior levies, Daniel's total unpaid liability at that time for his 1972 taxes and additions to tax (excluding *445 statutory interest) was $18,079.45. The Stipulated Decision further provided that Mary was not liable for any part of either the deficiency in 1972 income tax or the addition to tax. Finally, the Stipulated Decision provided that upon entry of the Stipulated Decision, Daniel waived the restrictions of section 6213(a), which otherwise prohibited respondent's assessment and collection of the deficiency and interest until the decision of the Tax Court became final. On May 2, 1977, respondent made an assessment against Daniel for an income tax deficiency of $28,664, an addition to tax of $3,616 pursuant to section 6651(a), and statutory interest of $3,901.60, for a total assessment of $36,181.60. However, because of prior levies on Daniel's bank accounts during April 1972, which amounted to $14,200.55, Daniel's actual unpaid liability as of May 2, 1977, was only $21,981.05. On October 5, 1977, respondent's *446 agent executed a notice of lien based on the May 2, 1977 assessment in the amount of $36,181.60. This notice was filed with the Los Angeles County Recorder's Office on October 17, 1977. At the time he was released from prison in 1976, shortly before he executed the December 15, 1976 grant deed to petitioner, Daniel had the following assets: Assets
Approximate Value
Cash
$600
Miscellaneous painting equipment
(a few ladders, brushes, and
cans of paint)
400
1969 3/4 ton Ford Pickup
1,000
1972 Buick or 1967 Cadillac
automobile
1,000
Daniel had no bank accounts and no stocks or bonds. Daniel owned the Evanwood property and at least one other piece of real property, the Pico Rivera property. Daniel was also owed several thousand dollars by various personal friends, although these debts were undocumented and unsecured. At the time of the transfer to petitioner in December of 1976, Daniel also believed that he was entitled to approximately $50,000 of the $105,640.48 that the IRS had released to his attorneys on November 29, 1976. Daniel, a house painter by vocation, was unemployed for the remainder of 1976 after his release from prison. On or about September 5, 1977, the *447 IRS Fresno Service Center was in the process of abating the 1972 assessment of $443,840 against Daniel as a result of the Stipulated Decision entered by the Court on March 16, 1977.However, in the process of transferring Daniel's credits of $14,200.55 collected from the 1972 assessment to the stipulated judgment, the Fresno Service Center erroneously refunded to Daniel and Mary two of the previously levied amounts ($1,419.31 and $8,844.19), plus statutory interest, for a total of $13,034.56. In August of 1977, Revenue Officer Ted Martin (Martin) was assigned Daniel's collection account. Shortly thereafter, Daniel telephoned Martin to discuss his tax liability for 1972. In their telephone conversation, Daniel told Martin that Daniel's attorneys held approximately $100,000 in cash in which Daniel had a property interest. This was the money seized from Daniel's safety deposit box in 1972 that the IRS had released to Daniel's attorneys in 1976. Martin thereupon served a notice of levy upon one of Daniel's attorneys, who responded that he owed Daniel no money. Acting upon the advice of its counsel, the IRS determined not to pursue any further action against Daniel's attorney, accepting *448 the attorney's claim that Daniel had assigned those funds as payment of attorneys' fees. Martin testified that the attorney had produced a document purportedly signed by Daniel assigning some $100,000 to him for attorney's fees. Daniel understood his agreement with his attorneys to be a standard contingent fee arrangement calling for the attorneys to receive one-third of the net funds (e.g., net of costs) recovered from the IRS and for the remaining two-thirds to be used to satisfy Daniel's outstanding tax liability with any balance to be refunded to him. These attorneys represented Daniel both in his defense of the narcotics prosecution and with his tax problems resulting from the 1972 jeopardy termination and assessment. At the time this case was tried, Daniel had a lawsuit pending against his former attorneys over the $105,640.48 the IRS had released to them on November 29, 1976. On November 21, 1977, Martin and Daniel met in order to ascertain whether or not Daniel possessed any assets that Martin could use to satisfy Daniel's tax liabilities. Martin questioned Daniel about his assets and liabilities at that time. Based on Daniel's responses, Martin prepared a Collection *449 Information Statement, which Daniel signed, showing the following assets and values: Net Equity Value
(Fair Market Value Minus
Item
Balance of Purchase Debt)
Cash
$ 8,000
Bank Accounts
500
Stocks and Bonds
Insurance - Cash or Loan Value
Accounts/Notes Receivable
Household Furniture
Real Property
Vehicles: 1969 Ford
1,000
1972 Buick
500
Total:
$10,000
The $8,000 in cash was the remaining balance of the $13,034.56 that the IRS Fresno Service Center had erroneously refunded in September of 1977. Daniel refused to comply with respondent's demand that he return the erroneous refund. The record does not establish what steps, if any, respondent took to discovery the location of the remaining $8,000 in cash or to levy upon it. Martin checked with the records of California Department of Motor Vehicles to identify the vehicles Daniel had disclosed. Martin discovered a 1969 Ford pickup truck and a 1967 Cadillac sedan registered to Daniel. Since there were no prices listed in a used car buyer's guide for vehicles of that age, Martin placed a value of $1,000 on each vehicle. Martin did not find a 1972 Buick registered to Daniel. Because he had not *450 seen the vehicles, Martin did not know their condition. Accordingly, he chose not to seize and sell these vehicles for payment of taxes, assuming that after collection costs, the revenue secured would be negligible. The record does not indicate that Martin ever asked Daniel to be allowed to inspect the vehicles or otherwise asked Daniel the location of the vehicles. At his November 21, 1977 interview with Martin, Daniel claimed to have a sum of money in a bank account at a branch of Bank of America in Buena Park. Martin tried to identify the specific bank branch where Daniel's alleged account was located, but could not do so because there were several branches of Bank of America in Buena Park. Unless a third party produced checks drawn by a taxpayer, the only method that Martin used to discover a taxpayer's bank account was to ask the taxpayer himself. From his interview with Daniel and from his own investigation, Martin discovered various outstanding liabilities of Daniel. First, Martin identified an outstanding Federal tax liability of $32,250, approximately the total outstanding unpaid liability from the May 2, 1977 assessment, without credit for the amounts erroneously *451 refunded to Daniel and Mary. Next, Martin discovered a state tax lien of $11,099.24 against Daniel. Finally, he contacted Daniel's bail bondsman and discovered a note for $6,000, secured by a deed of trust. The record does not disclose what property (or indeed whose property) secured the note to Daniel's bail bondsman. Thus, according to Martin's investigation and determinations, on November 21, 1977, Daniel's assets and liabilities were as follows: Assets
Cost
Fair Market Value
Cash
$8,000.00
$ 8,000.00
Accounts receivable
None
None
Notes receivable
None
None
[7]Merchandise inventory Unknown
400.00
Cash surrender value of life
insurance  None
None
Furniture and fixtures
None
None
[7]Machinery and equipment Unknown
2,000.00
Real estate
None
None
Securities
None
None
Automobile - 1969 Ford Pick-Up
Truck  Unknown
1,000.00
Automobile - 1967 Cadillac
Sedan  Unknown
1,000.00
Total Assets
$12,400.00
*452 Liabilities
Amount
Accounts payable
None
Notes payable
None
Loans payable
None
Accrued real estate taxes
None
Other State and local taxes accrued
Unknown
Federal taxes due
32,250.00
Federal taxes accrued, but not assessed
None
Mortgages
None
Judgments
None
Certificate of State Tax Lien, State of California
11,099.24
Note, Secured by Deed of Trust (Bail bondsman)
6,000.00
Total Liabilities
$49,349.24
Excess of Liabilities over assets
$36,949.24
Based on the limited collection efforts described above and Daniel's statement during the November 21, 1977 interview that he was unable to make any payments on his 1972 tax liability, Martin concluded that Daniel did not own assets or have other sources of payment from which his liabilities for 1972 income tax and addition could be collected. Accordingly, Martin recommended the determination of transferee liability against petitioner for Daniel's transfer of the Evanwood property to her in December of 1976. Martin arrived at an estimate of the fair market value of the Evanwood property as of December 15, 1976, in the amount of $37,500. Martin based this estimate upon prices reported in real *453 estate periodicals and upon opinions he solicited from local realtors. Although he had made other comparable real estate value estimates in other collection cases, Martin was not qualified as, and was not offered by respondent as, an expert to testify about real estate values. Respondent did not present any qualified expert testimony regarding the value of the Evanwood property on the date of the transfer here in question. Petitioner conceded that the Evanwood property was worth at least $27,000 on December 15, 1976. On May 2, 1979, [8] respondent mailed to petitioner a notice of transferee liability determining that, because of Daniel's transfer to her of the Evanwood property, petitioner was liable as a transferee for his 1972 tax deficiency and addition to tax in the total amount of $28,348.95, plus interest as provided by law. Petitioner timely filed a petition in this Court for a redetermination of that transferee liability. *454 On March 26, 1980, respondent executed three certificates releasing the Federal tax liens filed upon the April 10, 1972 termination assessment.One of these three notices of release specifically identified certain real property owned by Daniel and Mary, property that was neither the Evanwood property nor the Alhambra property. These notices of release were filed with the Los Angeles County Recorder on April 7, 1980. ULTIMATE FINDINGS OF FACT 1. The period of limitations under section 6901(c)(1) had not expired at the time the notice of transferee liability was mailed to petitioner on May 2, 1979. 2. Daniel was not insolvent when he transferred the Evanwood property to petitioner, nor did the transfer render him insolvent.
3.Daniel did not transfer the Evanwood property to petitioner with the actual intent to hinder, delay, or defraud his creditors. OPINION Respondent has determined that petitioner is liable for her father's (Daniel Elizalde's) unpaid 1972 tax liability because of her father's transfer to her of the Evanwood property. Petitioner first argues that, regardless of the substantive merits of respondent's determination, the statute of limitations bars respondent *455 from asserting transferee liability against her because respondent did not send her a timely notice of transferee liability. We disagree. Section 6901(c) provides, in pertinent part, as follows: (c) Period of Limitations.--The period of limitations for assessment of any such liability of a transferee or a fiduciary shall be as follows: (1) Initial Transferee.--In the case of the liability of an initial transferee, within 1 year after the expiration of the period of limitation for assessment against the transferor; (2) Transferee of Transferee.--In the case of the liability of a transferee of a transferee, within 1 year after the expiration of the period of limitation for assessment against the preceding transferee, but not more than 3 years after the expiration of the period of limitation for assessment against the initial transferor; except that if, before the expiration of the period of limitation for the assessment of the liability of the transferee, a court proceeding for the collection of the tax or liability in respect thereof has been begun against the initial *456 transferor or the last preceding transferee, respectively, then the period of limitation for assessment of the liability of the transferee shall expire 1 year after the return of execution in the court proceeding. Thus, in the case of an initial transferee, such as petitioner, the period of limitations for assessment against her expires one year after the expiration of the period of limitations for assessment against her transferor. Petitioner's arguments that the limitations period against her has expired are simply in error. It is well established that the mailing of a statutory notice to the transferor and the transferor's timely filing of a petition in this Court suspend the running of the limitations period against the transferee as well as against the transferor. First National Bank of Chicago v. Commissioner,112 F. 2d 260, 261-262 (7th Cir. 1940), affg. 40 B.T.A. 1378 (1939), cert. denied 311 U.S. 691 (1940); California Iron Yards Corp. v. Commissioner,82 F. 2d 776, 778 (9th Cir. 1936), cert. denied 299 U.S. 553 (1936); *457 Olds & Whipple, Inc. v. United States,86 Ct. Cl. 705, 22 F. Supp. 809, 819 (1938). See also Commissioner v. Gerard,78 F. 2d 485, 486-487 (9th Cir. 1935); Bales v. Commissioner,22 T.C. 355, 358-360 (1954). It is equally well established that the unexpired portion of the limitations period against the transferor must expire before the additional one year period against the transferee begins to run. Olds & Whipple, Inc. v. United States,supra,22 F. Supp. at 819-820; Continental Oil Co. v. United States,83 Ct. Cl. 344, 14 F. Supp. 533, 539-540 (1936), cert. denied 301 U.S. 694 (1937); Bales v. Commissioner,supra.[9]
Petitioner is likewise mistaken in her claim that respondent was required to act against her within one year after the entry of the Stipulated Decision against Daniel. Petitioner appears to rely upon the flush language following section 6901(c)(2), quoted above, providing that where, before the *458 limitations period against a transferee expires, respondent begins a court proceeding for collection of the tax or the liability against the transferor or last preceding transferee, then the limitations period against the transferee expires one year after return of execution in the collection proceeding.It is clear from the statutory language and case law that a Tax Court proceeding for redetermination of the transferor's deficiency is not a "court proceeding for the collection of the tax or liability in respect thereof" within the meaning of section 6901(c). Columbia Pictures Industries, Inc. v. Commissioner,55 T.C. 649, 655-657 (1971). Daniel and Mary filed their 1972 joint return on August 24, 1973, which commenced the running of the general three-year limitations period. Sec. 6501(a). On April 19, 1974, respondent sent Daniel and Mary a statutory notice, and they filed a timely petition with this Court. On March 16, 1977, we entered a Stipulated Decision in Daniel and Mary's case. The statutory notice to Daniel and Mary and their petition in this Court suspended the period of limitations on assessment against Daniel, the transferor, until May 15, 1977, 60 *459 days after the Tax Court's decision against Daniel became final.[10] Sec. 6503(a)(1). At that point, the unexpired portion of the three-year limitations period against Daniel--two years and 127 days--resumed running. Thus, the limitations period against Daniel did not expire until September 19, 1979, and respondent had one year thereafter, until September 19, 1980, to proceed against petitioner as transferee. Consequently, respondent's mailing to petitioner of the notice of transferee liability on May 2, 1979, was timely. Section 6901 provides, in part, as follows: (a) Method of Collection.--The amounts of the following liabilities shall, except as hereinafter in this section provided, be assessed, paid, and collected in the same manner and subject to the same provisions and limitations as in the case of the taxes *460 with respect to which the liabilities were incurred: (1) Income, Estate, and Gift Taxes.-- (A) Transferees.--The liability, at law or in equity, of a transfcree of property-- (i) of a taxpayer in the case of a tax imposed by subtitle A (relating to income taxes), * * * Thus, section 6901 does not create transferee liability but merely provides a procedure for respondent to collect from a transferee the unpaid tax liability of a transferor.
Basically, respondent has only the substantive rights against a transferee that other creditors have. John Ownbey Co. v. Commissioner,645 F. 2d 540, 543 (6th Cir. 1981), revg. on other grounds a Memorandum Opinion of this Court; Segura v. Commissioner,77 T.C. 734, 742 (1981). Whether a transferee is actually liable for the unpaid tax liability of the transferor is determined under state law. Commissioner v. Stern,357 U.S. 39 (1958); Scott v. Commissioner,70 T.C. 71, 79 (1978). Since the transfer here at issue took place in California, California law governs. *461 John Ownbey Co. v. Commissioner,supra,645 F. 2d at 543; Adams v. Commissioner,70 T.C. 373, 390 (1978), affd. in an unpublished opinion, 688 F. 2d 815 (2d Cir. 1982); Fibel v. Commissioner,44 T.C. 647, 657 (1965). Respondent has the burden of proving petitioner's liability as a transferee. Sec. 6902(a); Rule 142(d). Daniel's tax liability for 1972 is conclusively established for this proceeding by the Stipulated Decision entered in this Court in his case. Segura v. Commissioner,supra,77 T.C. at 743; Krueger v. Commissioner,48 T.C. 824, 830 (1967). California has adopted the Uniform Fraudulent Conveyances Act. Cal. Civ. Code § 3439, et seq. (West 1970). Respondent argues that Daniel's conveyance of the Evanwood property to petitioner was fraudulent as to him, both under the constructive fraud test and the actual fraud test. Constructive Fraud
Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent *462 as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration. Cal. Civ. Code § 3439.04 (West 1970). A person is insolvent when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured. Cal. Civ. Code § 3439.02(a) (West 1970). The facts of record in this case do not establish that Daniel was either insolvent at the time he transferred the Evanwood property to petitioner, or that the transfer rendered him insolvent. The parties disagree about which transfer was the "conveyance" for purposes of this case. While the result would be the same under either transfer, we agree with respondent that the first, separate deed from Daniel to petitioner, dated December 15, 1976, should be treated as the determinative transfer for purposes of this case. Even if the Evanwood property was the community property of Daniel and Mary, that deed would have been effective to convey to petitioner Daniel's interest *463 therein. Pretzer v. Pretzer,215 Cal. 659, 12 P. 2d 429, 430 (1932); Gantner v. Johnson,274 Cal. App. 2d 869, 79 Cal. Rptr. 381, 386 (1969). Cf. Andrade Development Co. v. Martin,138 Cal. App. 3d 330, 187 Cal. Rptr. 863 (1982). [11] Since Mary is not liable for any of Daniel's unpaid tax liability, only Daniel's transfer may be set aside as a fraudulent conveyance.The conveyance with which we are concerned is the December 15, 1976 grant deed from Daniel to petitioner, and we must examine Daniel's solvency as of that date. *464 First, as to Daniel's debts, by the time of the transfer, it was clear under Laing v. United States,423 U.S. 161 (1976), that the 1972 jeopardy termination-assessment was procedurally defective and that is probably why the $105,640.48 was returned to Daniel's attorneys in November of 1976. [12] That procedurally defective assessment of $443,840 cannot be considered a "debt" because it was no longer a legal liability of Daniel's. [13] And although the entire amount respondent determined as a deficiency against Daniel in April of 1974 would ordinarily be considered a debt, [14] respondent has presented no evidence of that amount. The only evidence of record we have of the "debt" arising from Daniel's tax liability is the amount ultimtely reflected in the Stipulated Decision. We will assume for purposes of our discussion that the state tax lien and the note to the bail bondsman, identified by respondent's collection officer as liabilities of Daniel's on November 21, 1977, were also outstanding liabilities on December 15, 1976. This results in Daniel's total liabilities on December 15, 1976, as follows: Liability
Before Transfer
After Transfer
Tax liability (deficiency & additions)
$33,280.00
$33,280.00
Interest on Tax liability (approximately)
3,100.00
3,100.00
State tax lien
11,099.24
11,099.24
Note to bail bondsman
6,000.00
6,000.00
First deed of trust on Evanwood Property
9,581.53
Totals
$63,060.77
$53,479.24
*465 *466 Before and after he transferred the Evanwood property to petitioner on December 15, 1976, Daniel had at least the following assets: Value
Asset
Before Transfer
After Transfer
Cash
$ 600.00
$ 600.00
Miscellaneous painting equipment
400.00
400.00
1969 Ford Pickup
1,000.00
1,000.00
Sedan (1972 Buick or 1967 Cadillac)
1,000.00
1,000.00
Credit for amounts levied by respondent
(held against tax liability)  14,200.00
14,200.00
Evanwood Property
[15] 27,000.00
Totals
$44,200.00
$17,200.00
*467 Respondent argues that these were Daniel's only assets on December 15, 1976, and therefore Daniel was insolvent both before and after he transferred the Evanwood property to petitioner. We do not agree. We have found that, after his release from prison shortly before the transfer here at issue, Daniel owned an interest in at least one piece of real property other than the Evanwood property and other than the Alhambra property. We based this finding on several pieces of evidence. First, Daniel testified that he owned what he described as the "Pico Rivera" property. Second, one of the notices of lien filed by respondent in 1972 upon the procedurally-defective termination assessment specifically identified a piece of real property owned by Daniel and Mary that was neither the Evanwood property nor the Alhambra property.The release of lien filed in 1980 also specifically identified this same piece of real property. Since there was a notice of tax lien filed against this particular piece of realty from 1972 through 1980, it is unlikely that Daniel and Mary disposed of it before December 15, 1976. [16] Finally, the schedule of Daniel's assets and liabilities in November *468 of 1977 that Revenue Officer Martin prepared identified a note to Daniel's bail bondsman secured by a deed of trust. This schedule did not list as an asset any real estate. Although it is possible that a third party executed the deed of trust upon his or her own property as an accommodation to Daniel, it is just as likely that this deed of trust was upon real estate in which Daniel had an interest.While we have assumed that the real property identified in the 1972 lien notice is what Daniel described as the "Pico Rivera" property, if that is not the case, then Daniel had two properties (other than Evanwood and Alhambra) and one of them may well have been the one securing the $6,000 note to Daniel's bail bondsman. [17] As the table of assets and liabilities above shows, Daniel's liabilities after the transfer exceeded his other assets by at most $36,279.24. Even disregarding the money (undocumented and unsecured loans) that Daniel's friends owed him, and his still pending claim against his attorneys in connection with the $105,640.48 the IRS returned to them, [18] it is quite possible that the net value of this other piece or pieces of realty could equal or exceed $36,279.24.Since *469 respondent has presented no evidence of the value of and encumbrances on this realty, nor any evidence of disposition of this realty prior to December 15, 1976, we conclude that the record fails to show that Daniel was insolvent either before or after his transfer to petitioner of the Evanwood property. Since Daniel's insolvency has not been shown, Daniel's conveyance to petitioner of the Evanwood property was not constructively fraudulent under *470 Cal. Civ. Code § 3439.04 (West 1970). Accordingly, we need not decide whether petitioner gave Daniel "fair consideration" for the transfer within the meaning of this section. [19] See Aggregates Associated, Inc. v. Packwood,58 Cal. 2d 580, 25 Cal. Rptr. 545, 549, 375 P. 2d 425 (1962); Hansford v. Lassar,53 Cal. App. 3d 377, 125 Cal. Rptr. 804, 811 (1975). *471 Actual Fraud
Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors. Cal. Civ. Code § 3439.07 (1970). Thus, under California law, if a person transfers property actually intending to defraud, hinder, or delay his creditors, it is fraudulent even if the transfer was for fair consideration, Burrows v. Jorgensen,158 Cal. App. 2d 644, 323 P. 2d 150, 153 (1958); Heffernan v. Bennett & Armour,110 Cal. App. 2d 564, 243 P. 2d 846, 859 (1952), and even if the transferor was solvent before and after the transfer. Hansford v. Lassar,supra,125 Cal. Rptr. at 812; TWM Homes, Inc. v. Atherwood Realty & Investment Co.,214 Cal. App. 2d 826, 29 Cal. Rptr. 887, 897 (1963). The transferor's intent to defraud is a factual question. Estate of Cook,64 Cal. App. 3d 852, 135 Cal. Rptr. 96, 105 (1976); Neumeyer v. Crown Funding Corp.,56 Cal. App. 3d 178, 128 Cal. Rptr. 366, 369 (1976); *472 TWM Homes, Inc. v. Atherwood Realty & Investment Co.,supra,29 Cal. Rptr. at 897. Such intent may be proved by circumstantial evidence such as the circumstances surrounding the transfer and the relationship and interests of the parties to the transfer. Aggregates Associated, Inc. v. Packwood,supra,25 Cal. Rptr. at 548; Neumeyer v. Crown Funding Corp.,supra,128 Cal. Rptr. at 369; Slater v. Bielsky,183 Cal. App. 2d 523, 6 Cal. Rptr. 683, 686 (1960); Cooper v. Cooper,168 Cal. App. 2d 326, 335 P. 2d 983, 989 (1959). Although the absence of fair consideration is not required where the transferor actually intends to defraud his creditors, in discerning the transferor's intent, the absence of a fair consideration may be taken as an indicium or "badge" of fraud. Neumeyer v. Crown Funding Corp.,supra,128 Cal. Rptr. at 369. For purposes of our discussion on this issue, we shall assume for the moment that petitioner did not give fair consideration for the transfer.Cf. footnote 19, supra.Likewise, the close family relationship between transferor and transferee, *473 if not an indication of fraud, at least requires full and careful scrutiny to assure the bona fides of the transaction. See and compare Kirkland v. Risso,98 Cal. App. 3d 971, 159 Cal. Rptr. 798, 802 (1979); Wood v. Kaplan,178 Cal. App. 2d 227, 2 Cal. Rptr. 917, 919 (1960); Burrows v. Jorgensen,supra,323 P. 2d at 153; Menick v. Goldy,131 Cal. App. 2d 542, 280 P. 2d 844, 847 (1955). Although these factors may tend to indicate fraud, [20] upon all the facts of this case, we do not believe that Daniel intended to hinder, delay, or defraud his creditors, particularly respondent, when he transferred the Evanwood property to petitioner. *474 When Daniel transferred the Evanwood property to petitioner, he did not believe that it would be necessary to resort to that property, or any other property of his, for payment of his 1972 tax liability. He also believed that the IRS was not interested in the Evanwood property as a source for payment of his taxes.The facts of record corroborate Daniel's testimony regarding his state of mind at the time. Barely two weeks before the transfer, the IRS released to Daniel's attorneys the $105,640.48 it had seized from Daniel's safety deposit box on the day of Daniel's arrest in 1972. Daniel believed that, after payment of attorneys' fees and costs, the balance of this money would be adequate to satisfy his 1972 tax liability. [21] Although the record appears to suggest that the entire $105,640.48 was assigned to Daniel's attorneys, this was not his understanding of his arrangement with them. Daniel believed that the attorneys were merely entitled to a standard contingent fee of one-third, net of costs. Daniel is still asserting his claim to some of that $105,640.48 in his pending lawsuit against those attorneys. Moreover, before Daniel signed the grant deed to petitioner, he attempted *475 to perform a title search to determine whether respondent had a lien or levy against the Evanwood property. Although he had no experience in performing a title search, Daniel obtained the assistance of county employees at the Recorder's Office. He found no lien notice or levy. In fact, none of the lien notices filed in 1972 specifically identified the Evanwood property. Even though Daniel's views regarding his fee arrangement with his attorneys and the tax liens on the Evanwood property may have been wrong, his state of mind and actions all indicate that his intent when he conveyed the Evanwood property to petitioner was not to defraud the IRS out of the taxes he owed. *476 Respondent presented no evidence regarding Daniel's relationship with his other creditors. Moreover, Daniel owned other real property after the December 15, 1976 transfer. We will not infer an actual intent to defraud his other creditors simply from the fact that Daniel owed them money when he made the transfer here in issue. On this record, we cannot find that in transferring to petitioner the Evanwood property, Daniel intended to hinder, delay, or defraud respondent or any of his other creditors. Daniel's transfer to petitioner of the Evanwood property was not fraudulent (actually or constructively) as to Daniel's creditors under California law. Cal. Civ. Code § 3439, et seq. (West 1970). Accordingly, we need not address petitioner's argument that respondent did not make reasonable collection efforts against Daniel before proceeding against her as transferee. [22] See Bellin v. Commissioner,65 T.C. 676, 683 (1975); Kreps v. Commissioner,42 T.C. 660, 669, 671 (1964), affd. 351 F. 2d 1 (2d Cir. 1965); Bartmer Automatic Self Service Laundry, Inc. v. Commissioner,35 T.C. 317, 322 (1960). Since respondent *477 has failed to prove that petitioner is liable at equity or law for Daniel's taxes, Decision will be entered for the petitioner.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable year in question, and all references to Rules are to the Tax Court Rules of Practice and Procedure.↩
2. Section 6851 was substantially amended by the Tax Reform Act of 1976, sec. 1204(b), Pub. L. 94-455, 1976-3 C.B. (Vol. 1), 172-173. For ease of discussion, we shall sometimes refer to procedures under pre-1976 section 6851↩ as "jeopardy terminations and assessments" and to the post-1976 procedures as "jeopardy assessments." 3. The items do not add up to the total stipulated by the parties, and there is no explanation of the $ .08 error. Since this is a deminimis↩ figure, we will accept the total as stipulated. See footnote 5 below.
4. Although the parties stipulated that these lien notices were all filed on April 10, 1972, the certified copies of the notices submitted as joint exhibits list the dates shown. Accordingly, we accept the dates shown on the exhibits and disregard the parties' stipulation to the contrary. See Jasionowski v. Commissioner,66 T.C. 312, 316-318↩ (1976). 5. This reduced amount appears to reflect the $14,200.55 already levied by the IRS.↩
6. This Stipulated Decision, by its express terms, did not take into consideration the 1972 jeopardy termination and assessment, but did recite the prior payments totalling $14,200.55 resulting from the levies on Daniel's bank accounts in 1972. See footnotes 3 and 5 above.↩
7. These items were disclosed to Martin by Daniel at their November 21, 1977 interview, but Martin erroneously omitted them from the written schedule of assets and liabilities he had prepared. At trial, Martin agreed that these items should be included and had been erroneously omitted from the schedule.↩
8. Petitioner's objection that respondent has not proven the date the notice was sent is not well taken. Under our Rules, a copy of the statutory notice must be attached to the petition, Rule 34(b)(8), which petitioner did here. If petitioner disputes the date of mailing, she must plead that in her petition. Rule 34(b)(4). Here, petitioner alleged in her petition and respondent admitted in his answer that the statutory notice was mailed on May 2, 1979. Thus, that fact is conclusively established for this case.↩
9. See also Bos Lines, Inc. v. Commissioner,T.C. Memo. 1965-71, affd. 354 F. 2d 830, 835↩ (8th Cir. 1965).
10. In the Stipulated Decision, Daniel waived the restriction of section 6213(a), thus rendering the decision final as of March 16, 1977, the date the Court entered the Stipulated Decision, rather than 90 days thereafter. See secs. 6213(a), 7459(c), 7481(a), and 7483.↩
11. Even if viewed as a gift of community property by Daniel to petitioner without Mary's joinder, see Cal. Civ. Code § 5127 (West 1983), it was at best voidable by Mary, not wholly ineffective. Andrade Development Co. v. Martin,138 Cal. App. 3d 330, 187 Cal. Rptr. 863, 866 (1982); Gantner v. Johnson,274 Cal. App. 2d 869, 79 Cal. Rptr. 381, 386↩ (1969). Mary's quitclaim deed in February of 1977 ratified any "gift," regardless of the second deed from Daniel, leaving in our view, the December 15, 1976 deed from Daniel to petitioner as the appropriate conveyance to examine.
12. Prior to 1976, section 6851 did not expressly require the mailing of a statutory notice of deficiency after a jeopardy termination of the taxpayer's taxable year and assessment of the resulting tax liability. However, on January 13, 1976, in the case of Laing v. United States,423 U.S. 161, the Supreme Court held that an assessment based on a section 6851 jeopardy termination must comply with the jeopardy assessment provisions of section 6861, including the mailing of a statutory notice within 60 days of the assessment. See sec. 6861(b). Respondent did not mail to Daniel a statutory notice of deficiency until April 19, 1974, 238 days after Daniel and Mary filed their 1972 joint return, and two years and nine days after respondent made the jeopardy termination and assessment. Consequently, under the Laing↩ decision, since a statutory notice was not mailed to Daniel within 60 days of the April 10, 1972 assessment, that assessment was procedurally defective. 13. Cal. Civ. Code § 3439.01 (West 1970), defines debt to include "any legal liability,↩ whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent." [Emphasis supplied.] 14. From the moment a cause of action arises, the full amount of that contingent, unliquidated claim is a "debt" for purposes of the California Fraudulent Conveyances Act. Hansen v. Cramer,39 Cal. 2d 321, 245 P. 2d 1059, 1060 (1952); Neumeyer v. Crown Funding Corp., 56l Ca. App. 3d 178, 128 Cal. Rptr. 366, 370, 373 (1976); Babcock v. Omansky,31 Cal. App. 3d 625, 107 Cal. Rptr. 512, 517↩ (1973). The tax deficiency that respondent determines in a statutory notice is clearly a "debt" since only by petitioning this Court for a redetermination can a taxpayer postpone assessment and collection of the deficiency. Sec. 6213(a).
15. Although respondent argues that the Evanwood property was worth $37,500, he has failed to prove that value. Respondent's sole valuation witness, Revenue Officer Martin, was not qualified to testify as an expert on valuation and was not offered by respondent as an expert witness. Respondent presented no other valuation evidence. Had respondent presented the data upon which Martin relied in making his valuation estimate, we might have been able to determine a value under the rule of Cohan v. Commissioner,39 F. 2d 540 (2d Cir. 1930). Daniel purchased the Evanwood property in 1971 for $27,000, and petitioner conceded that the property was worth $27,000 at the time of the transfer. The record discloses no basis for any higher value. Moreover, we have assumed for purposes of our decision that the Evanwood property was Daniel's separate property, as respondent argues. If it was community property, the value would be less (as would be the deed of trust indebtedness in the pre-transfer calculation), but the numbers would be the same after the transfer. If resolution of the question were essential to our decision, we would conclude that the Evanwood property was the community property of Daniel and Mary before Daniel's transfer to petitioner. That property was acquired by purchase during a long-standing marriage, and was thus, presumptively, community property. Cal. Civ. Code § 5110 (West 1983). Moreover, the funds used for any down payment and for the installment payments were also presumptively community funds. Cal. Civ. Code § 5110 (West 1983). Respondent is mistaken in his argument that the "presumption of title," from the identification of the property in the deed as Daniel's sole and separate property prevails over the general community property presumption. The cases upon which respondent relies ( In re Marriage of Lucas,27 Cal. 3d 808, 166 Cal. Rptr. 853, 614 P. 2d 285 (1980); Machado v. Machado,58 Cal. 2d 501, 25 Cal. Rptr. 87, 375 P. 2d 55 (1962); Gudelj v. Gudelj,41 Cal. 2d 202, 259 P. 2d 656 (1953)) all involved the determination of whether property held by the spouses was their community property or held in joint tenancy, a separate property estate. In such cases, it was the character of the spouses' ownership at issue, not the threshhold question of whether the wife had any interest. These cases do not affect the general rule that property onerously acquired during marriage, even though titled in the husband's sole name, nonetheless is presumptively community property. In re Duncan's Estate,9 Cal. 2d 207, 70 P. 2d 174, 182 (1937); In re Marriage of Millsberg,86 Cal. App. 3d 15, 150 Cal. Rptr. 142, 147↩ (1978). Daniel and Mary were not living separate and apart in 1971 when Daniel purchased the Evanwood property, and the record is wholly inadequate to trace that acquisition to any separate funds Daniel may have had.
16. Even though the lien was based upon the procedurally-defective 1972 assessment, nonetheless, the mere fact of the notice being on record would inhibit sale of the property. ↩
17. Respondent seems to argue that this deed of trust was on the Evanwood property, but the record is insufficient to so find. ↩
18. It is unlikely that either the loans or the claim would be considered assets for determining Daniel's solvency. Assets, for this purpose, generally include only those assets subject to court process (levy and execution). Stearns v. Los Angeles City School District,244 Cal. App. 2d 696, 53 Cal. Rptr. 482, 509 (1966); Wight v. Rohlffs,48 Cal. App. 2d 696, 121 P. 2d 76, 78, 81-83↩ (1941).
19. We note that petitioner has made a strong case that she indeed gave "fair consideration" for the transfer. She has supported Daniel's wife, Mary, ever since Daniel's arrest in 1972, and both Daniel and petitioner treated the conveyance of the Evanwood property at least, in part, as reimbursement for petitioner's past support of Mary. Daniel was obligated to support Mary, Cal. Civ. Code §§ 206, 242 (West 1982), and, at least for support before 1975, any person who provided a wife with "articles necessary for her support" when her husband neglected to support her could recover "the reasonable value thereof from the husband." Cal. Civ. Code § 5130 (West 1970), repealed as of January 1, 1975, 1974 Cal. Stat. ch. 1206, § 6. Although petitioner had an independent statutory duty to support her needy mother, Cal. Civ. Code §§ 206, 242 (West 1982), Cal. Civ. Code § 5130, supra, granted a right of reimbursement against the husband to "anyperson" who provided the wife with necessary articles of support, not merely to any person not otherwise obligated to support the wife. As between Daniel and petitioner, the primary duty to support Mary was Daniel's, not petitioner's. That petitioner did not expect repayment from Daniel might preclude her recovery in an action for unjust enrichment, see Payne v. Bank of America National Trust & Savings Assn.,128 Cal. App. 2d 295, 275 P. 2d 128, 133-134 (1954); Eklund v. Eklund,76 Cal. App. 2d 389, 173 P. 2d 50, 51-52 (1946), but it would not appear to affect petitioner's statutory right against Daniel. See St. Vincent's Institution For The Insane v. Davis,129 Cal. 17, 61 P. 476 (1900). (Person providing woman with necessities could recover under statute even though without knowledge of husband's existence or that woman was married.) New York recognizes that the discharge of an antecedent debt that arose out of the husband's obligation to support his wife may constitute "fair consideration" under the Uniform Fraudulent Conveyances Act.See Vinlis Construction Co. v. Roreck,67 Misc. 2d 942, 325 N.Y.S. 2d 457, 462 (1971), affd. 43 A.D. 2d 911 (1974), 351 N.Y.S. 2d 648, dismissed in part and denied in part, 35 N.Y. 2d 715, 361 N.Y.S. 2d 645, 320 N.E. 2d 277 (1974); Safie v. Safie,24 A.D. 2d 502, 261 N.Y.S. 2d 993 (1965), affd. 17 N.Y. 2d 601, 268 N.Y.S. 2d 561, 215 N.E. 2d 682 (1966). Moreover, the value of the property transferred (against which the fairness of any consideration given by petitioner would be tested) would also be reduced by a determination that the Evanwood property was Daniel's and Mary's community property, see n. 15, supra, and by any other indebtedness to which the Evanwood property may have been subject when petitioner acquired it. See n. 17, supra.↩
20. The other "badges of fraud" that respondent cites are inapposite in this case. Since we have found that Daniel owned an interest in other realty at the time he transferred the Evanwood property to petitioner, we cannot say that Daniel disposed of all or a majority of his property during the pendency of his Tax Court petition. Likewise, there was no transfer of property for the transferor's own future support. Rather, to the extent future support was involved ins the transfer, it was for the support of another (Mary) whom Daniel was and still is obligated to support.↩
21. Daniel estimated that approximately $50,000 of the money refunded to his attorneys was properly his. That amount would clearly have been adequate to satisfy Daniel's tax liability as determined by the Stipulated Decision in this Court. Aside from the assertions of Daniel and his attorneys that the $443,840 termination assessment was "ridiculous" (an opinion somewhat borne out by the ultimate amount of the stipulated deficiency), by the time of the transfer it was clear that the 1972 assessment was procedurally defective. Laing v. United States,supra.↩
22. In this case, however, the efforts of respondent's collection agent to recover Daniel's taxes from him were, at best, minimal. The agent (1) failed to examine Daniel's automobiles to determine salability, (2) ceased searching for Daniel's bank accounts when he could not find one in the bank and city identified by Daniel, and (3) most crucially, failed to investigate other real property owned by Daniel identified by information within the agent's possession (e.g., the Federal tax lien notices filed in 1972, the state tax lien, and the secured note to Daniel's bail bondsman). Also Daniel still had $8,000 of the erroneous refund in his possession in November of 1977, and respondent apparently did nothing when Daniel simply declined to return the money. Respondent simply issued a notice of transferee liability against petitioner because he already knew of that property. In no way do we condone the actions of Daniel in failing to pay his tax liability as previously determined by this Court, but he is not a party in this case.↩